We'll hear argument first this morning in case 2807, LeDure v. Union Pacific Railroad Co. Mr. Frederick. Thank you, Mr. Chief Justice, and may it please the Court. In 1904, this Court held in Johnson v. Southern Pacific that a motionless dining car was in use when a worker's hand was crushed while he was trying to couple the car with a locomotive. That case construed use under the Safety Appliance Act of 1893. In 1911, Congress incorporated the exact same statutory language in the first version of what became the Locomotive Inspection Act. In Brady, this Court held that a motionless car was still in use when an inspector was injured. In Lilly, this Court held that a locomotive tender was in use under the Inspection Act when an employee slipped while servicing a tender that was stationary. The slipping hazard there violated applicable regulations, and this Court upheld the worker's negligence per se claim. In this case, the Seventh Circuit disregarded those precedents and the statute's plain meaning of use. It held that the UP5683 locomotive was not in use because it was stationary, on a sidetrack, and part of a train needing to be assembled before its use in interstate commerce. Under this Court's precedents and the statute's plain meaning, a locomotive is in use when the carrier is employing it for the railroad's purposes. A brief stop in the middle of a journey to change crews and to power off the locomotive does not take the locomotive out of use. The UP5683 was still available as backup power to provide an electrical and hydraulic connection to the rest of the train and to provide braking capability when the train resumed its journey. Because this case is in the heartland of a carrier's use of a locomotive, the Court need not define the price contours of when a locomotive is not in use. Brady nonetheless suggests a workable standard. When the locomotive reaches a place dedicated to repair or the carrier withdraws the locomotive from service by making it inoperable. I welcome the Court's questions. If I could just start with the statutory language. Counsel, you use precedents under the Safety Appliance Act and the Locomotive Inspection Act pretty much interchangeably. But I wonder if that's fair because the sense of use of a locomotive strikes me as different than the sense of use of typical railroad cars. Locomotives, their primary purpose is to move and move things. Rail cars, you know, not the same way. So I wonder if it's fair to just use those precedents interchangeably. I think it is fair and there are a number of reasons why, Mr. Chief Justice. Let me just start with a statute. The Safety Appliance Act defines rail vehicles to include locomotives. So locomotives are encompassed within the protections provided by the Safety Appliance Act. Second, when Congress enacted the Locomotive Inspection Act, it adopted the very same words. And using the imperi materiae canon, the Court ordinarily would construe the same words to have the same meaning, particularly when they cover the same subject, which is rail safety for the protection of workers. Doctrinally, the Court has used that principle and the application of use in multiple cases. I can point you to Urey, to Lilly, to Tipton, where the Court has said that the precedents in the SAA context apply equally to the LIA context. You can readily think of situations where the point, of course, of my... I appreciate your answer, but the point of the question is that in the LIA, you're dealing particularly with locomotives. And, you know, it seems, suppose I have a car in the driveway, I wouldn't say the car is being used just because it's sitting there and I might want to use it later. Its primary purpose is to move some people around and not sit waiting, even if waiting ready to be used later on. Well, Your Honour, of course, that hypothetical doesn't describe our case because our case involved a locomotive connected to other train cars. It was midway through a journey. But to take your notion of use, Congress intended to broaden... No, but I think even in that case, and, you know, people might have different natural meanings, even in that situation, I would naturally say the rail cars are being used. They're not used for anything other than, you know, hauling goods and they're in the process of that. But you could say easily the locomotive is not being used because its primary purpose is to move and it's not doing that. So let me just stop there because I think it's important to know what use has to apply to. The statute says the carrier may use or allow to be used. So the focus has to be on what the railroad's purpose is in using or deploying the particular locomotive at that particular point in time. A locomotive, even dead, has important hydraulic, electrical, braking functions that it performs when moving from one place to another. A locomotive also can be redeployed for the purpose of satisfying the railroad's various logistical needs. So I think, Mr Chief Justice, to answer the question by defining use so narrowly that you're taking away all the various purposes and services that a carrier can put to use for that particular locomotive would be to significantly diminish the force that Congress was intending to enact by protecting worker safety. Because workers are on these locomotives, whether they are still or in motion, whether they were powered on or powered off. Many of the regulations apply to situations that are expressly for still locomotives. Well, and worker safety is protected whether you prevail or not, right? The FELA applies in this situation. The only purpose of the railroad statutes is to impose strict liability. Well, the statute under the FELA says that contributory negligence or assumption of the risk do not apply when there is a violation of the statute. And 54A under Felix 45 USC says that the regulations are to be treated as statutes for purposes of FELA protection. Here, the basic problem is the foreseeability of the risk. And I would submit that one of the challenges in just bringing a negligence claim in this circumstance is that the UP, Union Pacific, had just reacquired custody over this particular locomotive. It had not been inspected in a number of days. That inspection report is in the joint appendix. And so the question of where this particular slipping hazard arose makes a negligence case particularly hard because one can't identify where the breach of the duty occurred. We know that it was in violation of the regulations. We just don't know how that happened. And the whole point of having a negligence per se claim, as this court has recognized, and I think URI is the best case for this. There's also a Jones Act case called Kernan in which the court explained why these rules violations were particularly important for worker safety. And of course, having liability does both protect the worker's interests in remedying the particular harm, as well as incentivizing the carrier to keep up-to-date in compliance with those safety rules. Mr. Frederick, you said something, or you can respond to the Chief twice, of the functions that a dead locomotive serves in a train like this. I may have read it too quickly, but where is it in the record below? So, Your Honor, I would point you to a couple of places. There are brake functionings in the regulations that call on how dead locomotives are to be treated for braking functions. The JA is admittedly spartan about this point, but if I could point the court to the connections to the brakes, JA61 is one place where that is to be found. But I think the basic operation of a locomotive requires that it provide a connection, and that connection is not just physical, but it is also electrical, it is hydraulic, and the regulations call for when a dead locomotive is being transferred to continue to operate in these various modes, so that those braking and other hydraulic functions can... One argument that I've been thinking about, and it's in response to something the Chief said, which is it does seem odd to treat in use differently for locomotives and railroad cars, because an accident can happen to a worker, and it seems strange to have a different coverage if the worker was on the locomotive attaching the railroad, or on the railroad attaching the locomotive. It seems a little odd to have two different systems of coverage, isn't it? I think so, and that's why when Congress enacted the Safety Appliance Act, it included locomotives, so it would be odd to suppose that if a grab iron breaks, a clear violation of the plain terms of the Safety Appliance Act on a locomotive, that locomotive is deemed to be in use even if it is stationary, it's on a sidetrack, it is not part of a fully assembled train, but yet you would say that a locomotive is not in use when the purpose behind this particular locomotive engineer's task was to go onto the locomotive and determine, should I power it on, should it stay powered on, or should I power it off? And that's why I think this case really is in the heartland. The Seventh Circuit applied these three features that are nowhere in this Court's cases, and that's why this case ultimately must be reversed because there's no adherence to this Court's precedence for the logic behind these three factors that the Seventh Circuit relied upon. Mr. President, one last question. How do you differ from the SG? I don't think we do. I think the SG has a more sophisticated understanding of the regulations than our brief does, but I think the basic core of the position is the same. We've argued that the words allowed to be used also can be encompassed if you were to find a narrower definition of use because even in a hauling capacity, this locomotive was clearly allowed to be used for that purpose. If Mr. Ledour had determined, in his judgment, it was necessary to resume the train's passage from Salem to Dexter. Mr. Frederick, I'm a little puzzled by what you're arguing, or maybe more to the point, what you're not. If I understand the point, this negligence per se action can rely either on a statutory violation or on a regulatory violation. Is that right? Correct. And the regulation at issue here, which is the one about keeping floors clear of slipping hazards, that regulation does not use the word use. So why are we talking about the word use? If the railroad violated this regulation, that's the predicate for a negligence per se action, and there's no reference to use here. Your Honour, if I could give you a somewhat more detailed answer than you might like, this regulation was promulgated under both the Locomotive Inspection Act and the Federal Rail Safety Act of 1970. Historically, before the FRSA existed, injured rail workers would bring claims under the LIA and the negligence claim recognized in the court's cases from the 20s to the 40s. And so traditionally, the courts had instructions about how to instruct for a violation of the Locomotive Inspection Act and its associated regulations. I think this case comes out exactly the same way. It was pleaded as a violation of the LIA. The courts below decided it on that basis. The court granted cert on the basis that there was a violation of the LIA based on the use requisite. Is it possible that FELA claims could be brought directly based on Section 54A as a violation of regulations promulgated under the FRSA? I would take the position that they can. As the case comes to this court, however, with the long body of precedent that has been applied, we would submit that this also easily satisfies the pre-FRSA world of Locomotive Inspection Act claims that historically have been brought and that have been instructed as such in the lower courts. What about the situation where the locomotive's on the sidetrack for several days, which is one of the concerns raised by your friend on the other side, including then also the inspection requirement? Is it required to be inspected every day because it's, quote, in use while it's sitting there on the sidetrack or similar? Well, before a worker gets on the locomotive, even if it's been sitting for a couple of days, the railroad is charged with making sure that the locomotive is a safe place in which to work. And so the fact that it has been there for a couple of days, but it is still fuelled up, it has all its brake fluids, it has its battery fluids, it's operating in every meaningful sense, it is a hazard for any worker who might need to deploy it quickly, it makes perfect sense that in that situation it's still deemed use because it is used on the lines of the railroad under the meaning of the statute. Now, are there circumstances in which the storage might be so prolonged in which the railroad makes the locomotive functionally inoperable by locking the brakes or taking out all the fluids or compressing all of the electrical devices and that sort of thing? Then yes, I would acknowledge that there would be ways that the railroad would withdraw that locomotive from service. And the court in Brady recognized that. Right, the repair. Let me ask you about Brady because Brady is a very good case for you. But as the Chief Justice's questions point out, how does the SAA interact with the LIA? And can you give us some more about the history there? Because the SAA originally covers locomotives and still does. The LIA is originally not and then locomotives are added to the LIA. What are we to make of that when we think about does Brady win this case for you, which I think is your strongest point? Well, I think historically, Justice Kavanaugh, it's important to recognize that the early railroad cases involved defective couplers, grab irons, other situations where workers were attempting to work on various rail vehicles. By the 1910s and the Locomotive Inspection Act was enacted in 1911, the operation and equipment on railroad cars and locomotives had become so sophisticated that eventually what Congress realized was it needed to enact and defer to an expert agency to promulgate more specific rules for the safe use of locomotives. They are much more sophisticated pieces of equipment than rail cars are. And so the structure that it enacted was to enact regulation or to defer to the ICC, the Old Interstate Commerce Commission, the predecessor of the FRSA or the FRA, to promulgate the necessary rules and the regulations actually are quite voluminous when they concern locomotives for the very reason that Congress didn't want to have to keep up with all the locomotive technology as it was evolving. And so structurally, what Congress enacted was essentially the same sphere of protecting workers but it gave to the agency the authority to promulgate rules for safety. Mr. Frederick, I have just one more question. Under your position, if you have a locomotive that is on a side track and they say on the schedule, you know, the next time we're going to, I don't want to beg the question, the next time we're going to use the locomotive or we're going to do whatever you would say instead of use, is going to be in 10 days. You would say that that locomotive, but would you say that locomotive is in use throughout those 10 days? Yes, I would. And the reason is that locomotives are used for many purposes even before their necessary transiting functions. A locomotive engineer like my client could have said, we need to use the utility. Yeah, let's say that's not going on here. None of these other uses are taking place. It is there to be deployed by the railroad on schedule in order to meet its logistics needs. Even though it's 10 days. Even though it's 10 days. Okay. Justice Thomas, any questions? Thank you, Mr. Chief Justice. Just a couple. Mr. Frederick, you seem to put a lot of weight on the fact that the, it's suggested in your last question, last answer too, that the availability of the locomotive, even if it's not actually being used as, to haul, to pull the train, is also a use. Now, the most analogous, I was just thinking about that as you gave that answer. On my motor coach, I pull my car. And the brakes operate, the lights operate, there's a braking function, et cetera. When I'm towing that car, under your approach, is that car in use? Yes. No one else can use it, Justice Thomas. And the carrier, if I could analogize you to a carrier, would be having the exclusive purpose of that particular car at that particular time. So you are using it. And I assume that you've also connected the electricals so that when the brake lights of the motorhome go on, you deploy the brakes on the motorhome, the lights on the car behind also deploy. So that the persons following along behind know from the red lights on both the motorhome and on the car that a braking action is occurring. Yeah, I understand all, you know, that answer. But that's, the point of the car is not to be hauled behind the motorhome. You haul the car in order to use it when you come to a location. So that's, I think, it's just sort of, that's sort of an odd use of the term use. The, let me ask you one other question. What if you would say you're still using the locomotive even if your client had already tagged? Let's say you've gone in and tagged the locomotive for non-operation and slipped on the way out. Would you still say subsequent to the tagging that it was still in use? Yes. And the reason is that use is designed to serve the purposes of the railroad. Tagging it for a particular point in time to signal to other workers that this is a dead locomotive or that it is not to be entered. There are various tags that give different clues to different workers for different purposes. But the point of the rules, and I think that this is best reflected in Brady, there was an inspector. And if you apply that with Lilly where there was a slippage on a tender, the same kind of scenario has occurred. It would defeat the safety purposes of this entire regime, Justice Thomas, to say that somehow the worker controlled when the statute applied. That would be the most anomalous kind of holding the court could enact. One final question. You did not mention in subsection 1 of the LIA, it says that it uses the term safe to operate. What do you make, that seems to suggest that the purpose of this whole provision is to make sure that use is actually when the locomotive is operative, not when it's non-operative. Justice Thomas, I think that that constrains the term use really to functionally gut the operation of the statute. Of course, locomotives are primarily for hauling, but they serve so many other functions, and the carrier has the discretion in terms of how it is to be used or allowed to be used. And we all recognize that more than half of the injuries that occur to rail workers are when the locomotive is stationary. And so the idea that it is only using the phrase safe to operate, and so therefore that's the only way in which use is going to be construed, would be contrary to a long line of this court's decisions, including in the criminal context for drugs, where this court said that using a gun could mean to trade it for drugs. No, I think that's not my point. I'm not asking you to read it as to totally cancel out the term use. I'm asking you what work does it do if we use the term use as broadly as you want us to? Well, I think that there are ways that, and we've described them, for a carrier to take a locomotive out of use by making it in a repair, by putting it in a repair shop where it's not to be deployed on the line, where it is in a condition that it can't operate in any meaningful way because it doesn't have the fuel or the fluids, etc. But the point of the rules is, of course, to make sure that they're safe to operate. The idea behind that is that there are many, many processes that go into that to ensure worker safety while the locomotive is being serviced, it is being prepared for its journey, it is being active on the line. And Congress used very broad words, use, in order to describe an intent for that all of these operations would be covered by the ambit of worker safety. Well, the anomaly, though, is that you would say it's in use as you're hauling it to maintenance. But you say once it makes it to maintenance, it's not in use. It's in the same condition. Yeah, but it still also presents a hazard to the transportation crew that is moving it to a place of repair. And that's why the court in Brady and other cases have said that while that transportation crew is at risk, we're going to deem the locomotive or the rail car to be in use for these purposes. Thank you. Justice Breyer? Trouble I'm having initially with the case is it often happens in law, you have a word in a statute, and then lawyers propose test, which consists of other words. And those other words don't get you any further than the initial word. And I think use is somewhat ambiguous. And I think the test, for example, you use the word available to be deployed. Well, our engine is in the locomotive engineering factory. Joe, is it ready to be deployed? Yeah, ready. Send it to the railroad. Now, you'll have a way of saying we're not covering that. But I mean, so let's use use and not cover it. But I mean, OK. Now, as soon as I think that, I'm not sure I think that. But I'm thinking I think that. As soon as I think that, I think, well, what about this case? And here is where I have a problem. It sounds as if your client has said, look, it arrives in Salem 10 minutes ago. It's ready to leave in an hour. And it's still running. And they say, no, that isn't so. But this is summary judgment. How did they ever get summary judgment in their favor when there seemed to be a dispute as to the facts, which are, I would think, highly relevant facts? What happened? Well, I agree with you that the court below applied the wrong test and should not have rendered summary judgment. In fact, the only evidence and the only testimony was that this locomotive was on and that Mr. Ledour's role was to turn it off. So what was your view of the test that could be applied that would say it's not in use when it's arrived in 10 minutes, it's leaving an hour from now, and the motor's running? Well, I think that question is better addressed to my friend. I want both sides of that. To me, this is a heartland case of the use. These kinds of operations happen all the time. Crew changes occur for crew safety. There are refueling stops. Those things do not take a locomotive out of use simply because there is a temporary stop along the line. Now, I propose a test based on this court's decisions that say that when the railroad has put the locomotive out on its line, and that would distinguish the hypothetical you started with, Justice Breyer, there it was not on its line when it is in the facility, that it remains available for use, it remains serving the purposes of the railroad until it's sent to a dedicated place. You've got us copping out and you don't like it. Or to say, look, if what your client said is true, it is in use. Now, go have your trial. Here's the problem with that, Justice Breyer. The Union Pacific is now putting on devices to its locomotives for fuel safety purposes that automatically shut off its locomotives after a particular point in time. So do we really want to say that the statute goes on and off on the basis of an automatic turn-off switch? I wouldn't say that. I'd say in this case, we'll worry about the next case, next case. This is a perfect example of a common law approach. The word is use, and it's not going to get us any further to say available, because available is going to be sometimes you win this case, but you lose some other case. Who knows? Okay. Common law, look at use, look at the cases. In this case, you need the trial because of the affidavit. So as we said that, now, I don't think you'll like it, but I mean, I want to know what you think. I think certainly we win this case under that standard, Justice Breyer. There's no question about that. I think for clarity of the law, we've proposed a test that this derives from this court's decisions because it's been one that the railroad industry has basically adhered to when it knows that there is dedicated storage. And you can look at the Union Pacific's annual reports, and they talk about which of their locomotives are in storage and which ones are being actively used. The ones that are actively used may be temporarily halted for a particular short period of time, but they're still fueled up and ready to go, and if an engineer needs to use it for a particular purpose around the rail yard, it's there to be used. Justice Alito? Our decision to grant review in this case will not have achieved very much if all we do is to decide that this particular locomotive was or was not in use based on the particular facts of this case. And I think all the lawyers have a difficult line-drawing problem. So would you explain to me why the instances where a locomotive, in your view, is in use should be treated differently from those in which you think it is not in use? What is the feature that distinguishes those two cases, those two categories, and justifies a regime of strict liability in one and a negligence regime in the other? Justice Alito, I think that the best way to think about it is whether the locomotive could be operated, is operable. If it's been defueled, if it's in a repair facility, if it's in storage and it has been denuded of its capability to operate, I don't think it can be used in the way that the railroad intends to serve the various functions that the railroad might have. And that's why that kind of standard is one that basically comports also with the regulations, because the regulations for periodic inspection require that the locomotive be in a place where a worker can get underneath it. And if the worker is underneath a locomotive, it's because it's either been jacked up or there's been some well created underneath it. And that locomotive is not performing any of the normal services that the railroad bought the locomotive to perform. I see the difference between a locomotive that's moving and one that's stationary. And I see the difference between instances in which a locomotive is used or available for use for something that is distinctive about a locomotive, as opposed to a locomotive that's been turned into a museum piece, for example, or a little restaurant. But if a locomotive is not moving, for whatever reason, and somebody slips one, a railroad worker slips and falls, I don't really see the difference between the two situations that you're talking about. Why anybody would think that there should be a strict liability scheme for one and the negligence scheme for the other? Because the purpose of the rules is to ensure that when the worker gets on the motionless locomotive, it'll be a safe place to work, that there won't be a slipping hazard, that there won't be some other kind of grievous way that a worker could be injured. And that's different when the locomotive is on the railroad's line and is capable of operation in every meaningful way. Just because it's stopped doesn't decrease the danger to the worker. If anything, that's when it's more dangerous, because the worker has to encounter hazards that may have arisen as a result of the latest transit. All right, thank you. Mr. Sotomayor? Mr. Frederick, I'm not sure that you fully answered Justice Alito. His question, and I'm curious about the answer, too, is why does one call for strict liability and the other doesn't? And you gave a partial answer, I thought, earlier, which was the whole purpose of these acts is to protect railroad workers, correct? Yes. And so is there a difference between the railroad workers who are working on this dead locomotive to be part of the hauling mechanism and the guys who are in the shop or who are walking around the storage yard? I think that's Justice Alito's question. What's the difference that would give strict liability coverage for workers when in your definition of service but not when it's in the repair shop or on the side motionless? I think that the clearest way to think about it is that the dangers are unknown to the transportation crew, whereas when the locomotive is put in a repair facility, the repair workers have a much greater understanding of the problems with a locomotive that has been turned off, that doesn't have electrics running through it. That makes sense to me, but how about the workers in the storage yard? The workers in the storage yard, I think, are a harder case, but I think when the locomotive has been de-operationalized, there's certainly lower risk to the workers in that situation in getting it back up and running. But the point is that in drawing a line, I think it's an appropriate place to draw a line where you would be able to distinguish between the risks to the worker of an active on the line locomotive versus one that had been mothballed, essentially. And there are actually very few cases involving workers injured in storage facilities. I looked and I couldn't find them, and so when you look at where the case law has developed, where there are actual injuries and harms, they tend to be in the situations very much like this one, where the locomotive is on the line, it is temporarily stopped, it is about to move on to its journey, and someone gets hurt. Thank you. This is Kagan. This is Gorsuch. This is Kavanaugh. Yeah, just to follow up on what I see as the tension in this case and get your thoughts about how to resolve it, because I think the questions have illustrated that if we're just looking at use, how we normally think of the word in use, that you would have a problem, in part because it's not moving. Of course, Congress in 1924 took out moving, so that helps you. So I think just the ordinary understanding of use is not great for you, as the hypotheticals have illustrated. What helps you is the precedent of the SAA cases, which basically said that's not the way the term's being used in these statutes. And I think what also helps you is the point that most of the injuries on locomotives are when they're stationary, because otherwise we'd be gutting the statute. But the question then becomes, why take the SAA precedent, which helps you tremendously, and bring it into the LIA when, as a lot of the questions have illustrated, the LIA has a different focus? To me, that's a tough case for that reason. So if you can help me out. Well, I think to start with the word use, when before the LIA and the SAA were enacted, use had a meaning that included clothes in a wardrobe that were not being worn. And this court had recognized that as a use, an actual use of clothing. In the 1990s, when the court decided cases involving the use of guns, it said that one use of a gun could be trading it for drugs. You don't have to discharge the gun in order to use it. You can use it for many different purposes. Well, but assume, I guess my question assumed that I'm not completely buying that. But you do have the SAA precedent, which is very helpful. What problems would be created, I guess, maybe is another way to ask it. What problems would be created by saying the SAA precedent in use means one thing, the LIA precedent in use means something different? Would there be problems created by doing that? Yes, I think so. I mean, here, even just using the LIA as an example, let's take the Lilly case. That was a case involving a tender, which is a car used to help refuel a locomotive. But the slippage that occurred was while the tender was stationary. I don't think there's any argument that a tender in that circumstance was in use. It was performing a function. It would be odd to suppose, though, that the tender was not in use because it wasn't performing any function when it was traveling to the place where it was going to do a refueling operation. And so having too constrained a definition of use, Justice Kavanaugh, I think would really promote a lot of litigation over fairly simple examples where workers get hurt. And the reason why this court very early on adopted the principle, the imperi materiae canon, was because these statutes were really intended to be amendments to the FVLA and to promote worker safety and worker recoveries when they are injured. Thank you. Thank you, counsel. Thank you. Ms. Sinsack. Mr. Chief Justice, and may it please the court, a typical diesel engine weighs approximately 400,000 pounds and may contain up to 5,000 gallons of diesel fuel, in addition to an engine, an electric generator, and multiple starting batteries. For obvious reasons, such a powerful and complex machine presents a risk to employees working on and around it, whether the locomotive is hauling freight or being put to one of numerous other purposes that locomotives serve, from supplying power as a backup generator to moving cars around a yard to standing ready to rescue a nearby passenger train if its engine goes down. Accordingly, as this court has long recognized, once a carrier puts a rail vehicle into use, that rail vehicle remains in use until the carrier affirmatively withdraws it from active service for repair, storage, or retirement. This court should reject the respondent's invitation to retreat from its precedents and preserve the full scope of the safety protections that Congress enacted. Ms. Sinsack, if I understand the proposal you just made about what we should do, if you have a locomotive that is used to drive, carry trains and cars, and then you decide, we don't really need this one, why don't we sort of put it off to the side? And Justice Alito says you often see these. It'll be a little restaurant for people who want to come and have a nice railroad experience. But if we ever need it, it's going to be there, and it's going to be ready. And by the way, it generates electricity, and we can use that to run the lights out on the porch. That locomotive would be considered in use under your definition? I believe, until you said the last point, I believe that that locomotive would be in storage. And the FRA has long recognized... Well, it's there. You could use it. I mean, if they wanted to, they should kick out the diners and perhaps put some cars on it, and off it goes. I think there are a number of steps that would have to be taken in order to render that locomotive operable again. And so, no, it's not going to be in use. It's a restaurant. Again, the FRA has long recognized that when a carrier decides that it doesn't need to keep using the locomotive, that it isn't going to be an active service anymore, it can put it in storage, and it can put it in storage... No, but you said that until I said about the batteries. Everything else is the same, but if they're using its generator to power lights in the car, that would make it different? There's a very real concern, and frankly, I haven't asked FRA about this, and so I want to make sure, because I know that FRA is very concerned about its safety regulations applying when the locomotive's engine is on, and that's because many of the safety regulations are designed to ensure that we don't have electrical accidents, we don't have explosions, all of those sorts of things. So that's the only reason I'm hedging a little bit here. In general, I would say that once it has been withdrawn from active service as a locomotive, it's no longer in use. Well, I guess I'm just troubled by that, withdrawn from active service. It's there, it's ready to be used, is that active service? I think I would say it is not ready to be used, because it is currently... Okay, let's say it's there, and it's used to advertise the railroad, you know, a road goes by, and it's nice to look at the locomotive, and that's the only thing they're planning on, but it's ready to be used if it's needed. Again, I think active service is very helpful here, and the 1924 statute, of course, referred to safety for use in active service. Active service has long been understood in the railroad capacity to be when a locomotive is still being regularly used, and once it's retired from active service, for example, to become a restaurant, or maybe to become a historical artifact, that it's no longer in use within the meaning of the statute. Well, suppose it hasn't gotten into the service yet. Then it's not in use. Oh, not in use. Okay, so we have a yard, and the company puts all the locomotives in the yard, that they make one every three months, and there are now 15 in that yard, and they're all ready to go, and somebody calls from the train station and says, can we take any of those? Sure, take them, take them whenever you want, and occasionally they do. Okay, in use or not? So once the locomotive is placed into service, then yes. What does that mean, placed into service? It's there, sitting in the yard. Well, it needs to be filled with fuel. I mean, the 5,000 gallons of fuel is a pretty- So it's not used. In other words, the locomotive is not used when it's sitting somewhere and doesn't have fuel in it. That is correct. So the FRA- Oh, what happened to the thing about you used it, but until you withdraw from service, it's not been withdrawn from service. The FRA considers that a locomotive is withdrawn from service once its fluids have been drained and its battery has been detached. Oh, it hasn't attached the battery. But what they did was they withdrew, they didn't have fuel in it because we don't need fuel until next month because there's a big snowstorm, and that won't be cleared up until next month. Right, so the FRA is basically- What my point is is you want to say that is in use, and what you're doing is not following the words in your brief, you're following what is your common sense view of sort of what's in use or not, and that's why I say if it's in your brief, hey, you don't say anything in the brief of not having yet gone into service. I don't think. You talk about withdrawn from service. And here you have six words. That's why I started thinking we're not going to get anywhere or very far by substituting the words of your brief or any of these briefs for the word use. Now you don't agree with that. So explain. I do not agree with that. While a locomotive is being put to a carrier's purposes, then it is in use, I would say that as we noted in our brief, you can withdraw a locomotive from service and then it's no longer in use. So obviously if the locomotive has never been put into service in the first place, then it isn't in use. We do think that use and service are synonymous in this statute. Now we also think there is a very clear line here, and it's once a carrier has placed the locomotive, then they've done something to affirmatively withdraw it from service for storage or repair. And the key things that they might do are moving it to a controlled environment like a repair shop where you just don't have the same risk of an exposed railroad yard where you have trains moving everywhere, you have people going everywhere. So you put it in a controlled environment where the only people interacting with it are people who are expecting to be dealing with a defective locomotive. Or you've done something to make sure that there is no way that an employee is just going to hop on that train and turn it on or move it. So again, you can, and many railroads do, put locomotives in storage by detaching the battery and draining the fluids. And that way what you don't have is the risk that an employee is going to get on and move this, again, 400... Now what you're suggesting is certainly a possible approach. There's a common law approach. If we're Lord Banfield or Cook or somebody, we might take that. And you're suggesting if that's what we're trying to do, we ought to look at the purposes of this statute and decide whether the kinds of risks that are at issue in the case are the kinds of risks the statute is trying to prevent. That is one approach. Although what I would say is that you could apply the canon of in pari materia and say that we have interpreted the SAA in exactly this way, that the Locomotive Inspection Act was enacted at the same time that... I'm going to say, as you know, because you've written this already, so I do interrupt, that the first statute is done for all cars. And it's done for all cars because people wander around in those cars, particularly employees. But locomotives have special risks, particularly with fuel and other things. And so the statute is meant to go beyond that first statute. But how far beyond? And now we have the issue in the case. I'm actually not sure that we are arguing that the in use definition... They're not, but they are. Okay. Well, so for the FRA, the use means the same thing in the SAA and in the LIA. And it should be interpreted in that way because for basic reasons of clarity in the law, when you have two statutes enacted at approximately the same time covering the same topic, it sort of stresses reality to think that a regulated party would read those two laws and think that use means one thing is applied to a locomotive in one law and something entirely different is applied to a locomotive in a different law. So that doesn't work sort of as a matter of common sense. And it certainly doesn't work if you do want to look at purpose, or you want to look at legislative history, and you see that Congress is expressly borrowing from one statute in another. Use means the same thing. It's just that when you apply it, the use you put a locomotive to is to drive and pull cars. The use you put a rail car to is to have stuff in it and be attached to a locomotive. It's the same word. It looks to, I guess, the primary purpose of the object that's involved. That doesn't mean you're using the word differently. Well, at first I have to say that a locomotive may be used in many different ways. Yeah, I know. It can be a battery too. But most people think the primary use of a locomotive is to pull rail cars, not to sit around keeping the lights on. Well, I think we know that use is not defined in accordance in its primary purpose in the FAA from cases such as Johnson, where we had a dining car sitting there on the sidetrack just waiting to be picked up for the next journey. Now, that dining car was not functioning in its primary purpose. It was not serving people. The court said it didn't even matter whether it was full and ready to serve people. But it still said that that dining car was in use. And so I think you have to say that something else is going on. There's a different definition, and that definition is whether it's being put to the carrier's purposes. Would there be any problem, though, with saying that in use means one thing in the FAA and another thing in the LIA from the perspective of the regulators? Yes. There would be a large problem. And what would that be? I mean, it would create a safety gap. So just to take an obvious example, there's an assertion that if a train is being operated dead, it isn't in use. One of the key safety concerns that FRA has is a fuel tank that is too low to the ground so that if it moves even a little bit along the ground, it's going to rub, there's going to be a spark, and there's going to be an explosion. Now, that is a safety risk that occurs whenever the locomotive is in motion. Dead or alive, I suppose. And so that's the kind of safety gap that they're very worried about. Another, they think that the oil issue and the issue of fluids in the surfaces. So it's not just slipping. It's also that, again, we have an electric generator, we have batteries, we have an engine. What happens is if water pools in a locomotive, and that combines with the electricity, you can actually have a pool basically of charged water. Wheel defects are another issue. So if the wheel defect is even a little broken, if the wheel is even a little broken and it's being moved, then it can cause a derailment. So there is basically a regulatory gap that could possibly open if the court were to interpret them differently. And that's true even if the court was to say, well, at least if it's off and motionless. FRA has been very clear with me that if there is a locomotive in a yard that is capable of being turned on and moved, then it will be at some point. What theory of statutory interpretation are you applying? I don't understand you to be arguing that we should ask what use of a locomotive means in ordinary speech. And I haven't heard an argument about purpose to distinguish the category of cases you say justify strict liability versus those that would be governed only by negligence. So I take it that your argument is based on inferences about Congress's actual intent that we can draw from the relationship between the various statutes. Is that correct? No, I think that actually there is both a purpose of argument. There is an argument with respect to ordinary meaning. I mean, again, this court has said more. What is the purpose? What is the purpose of argument? So the purpose of argument is that Congress has long wanted to incentivize preventative maintenance, which is the railroads taking actions before problems arise. Now, I think you've asked, well, what about problems in the rail, in the repair shop? But the concern there is that Congress wants to create an incentive to take defective locomotives off the line, right? To take them where they're going to cause, even if they do cause a potential problem, it's not going to have the massive consequences that it would have if it's in a rail yard. I mean, you think about if a fuel tank explodes in a rail yard, there's lots of other fuel tanks right nearby. There's lots of other moving trains. So there's this, what FRA sees is if you, if a carrier has done something to remove that locomotive to a controlled environment where that kind of risk isn't around, then there doesn't need to be. What is your evidence of this overriding purpose to incentivize the removal of locomotives from service and the placement of them in repair shops? What's the evidence of that overriding congressional purpose? Well, if you look at the original act, which charged the ICC and carriers with the responsibility for implementing rules. And one of the key fixations was making sure that locomotives were inspected and that they were, any defects were repaired before being returned to use. So that's where you see this contrast between repair and use. And I just want to make a point too about the ordinary meaning, because I think in Bailey, this court recognized use is a word that which has many ordinary meanings. So I think the court gave the example of I use a gun to protect my home, but I've never had to use it. And both of those meanings of use are fully coherent. And it's just a question of looking at the context and determining, well, what particular meaning is at stake here? And I think we see with the LIA that it's the put to a purpose broader meaning. Do you think that if someone did a survey, ask people, is a stationary locomotive in use, being used as a locomotive, they would say, it is if it's in the process of being taken to a repair shop, but not if it's actually in the repair shop. And that we know from the FAA that Congress did consider that a use because it specifically enacted a safe harbor to say, well, you won't be on the hook for regulatory fines if you use a car in that way, but you will be on the hook for liability. Are you serious that you think if we asked that of people out on the street, that's what they would come up with? They would come up with your highly refined rule? This court always looks at context. So you have to look at the entire context. And I fully admit, if you just put the word use out and you kind of ask someone, a man on the street, who knows what they're going to say? And actually, I have tried this and you get a kind of range of responses. But once you give all of the information, once you give the context, once you give the fact that Congress itself made very clear that a rail vehicle continues to be in use when it is being hauled to a repair facility, then I think you're going to get my answer. The safe harbor. Maybe on First Street. Pardon? Maybe on First Street. Sorry, Justice Kagan. The safe harbor that you referred to, the party seemed to have a dispute as to whether it would apply under the LIA. Does the Solicitor General have a view on that? So the FRA has a regulation 229.9, and that is what creates sort of the equivalent of the safe harbor under the LIA. The LIA, of course, is different from the SAA in that it assigned a lot more responsibility to the agency originally, the ICC, and then the FRA. And so, and as I believe respondents say on page three of their brief, the agency has always interpreted it, the LIA, to permit locomotives to be moved safely to a place of repair. And if you look at 229.9, it says what you need to do. And basically, it's often you'll need to change the way in which you're using the locomotive to ensure that you're continuing to use it safely. So you might need to drop the miles per hour. You might, if it's a lead locomotive and the defect is in the headlight, you might need to move the locomotive to trailing service so it's no longer, its lights are no longer needed. But it's that sort of... But there's an equivalent safe harbor for safely transporting a locomotive to a repair site. Correctly. Safely using a locomotive for that particular purpose. And I think maybe it's just worth referencing because I think there was some discussion of the operating, safe to operate, that the original statute said safe to operate in the purpose to which it is put. And the FRA sees that as very important because when it's deciding whether something is being used unsafely, it looks at how it's being used. So you're never going to be in trouble for using a locomotive with a defective headlight in trailing service where that headlight isn't even necessary. Justice Thomas, any questions? Just briefly, Chief Justice. The counsel, can you... You seem to suggest that you can change the meaning of a statutory term use with regulations. You put a lot... Seem to put a lot of weight on the fact that there could be a regulatory gap if use is unsafely than you would like. No, we are not arguing that you can change the meaning of the word use with regulations. In fact, the FRA has been taking its cues from this court and this court's precedents in cases like Brady, such that it has always seen use as being this broader put to its purposes. You know, in Brady, the accident occurred while the car was being inspected. So it's actually the FRA has been taking its cues about how use should be interpreted from this court. Well, some of this seems a little bit counterintuitive, and I admit to being somewhat wrapped around the axle about this. But I asked Mr. Frederick whether or not when I towed my car, you heard the question, I was using it, and he said that I was. Now, I'm sure if you asked virtually any motor home or if they're using the car when they're not, they would probably know. Could you tell me why that is the right answer from your perspective, as opposed to just the ordinary meaning of use? Yes, and I think this goes back to a call I was having a moment ago. In the SAA, Congress made very clear that when a rail vehicle, such as a locomotive, is being hauled to another, to a repair destination, it is still in use. And in the provision of the SAA, they created a safe harbor, a regulatory safe harbor, but liability continued to apply. So I think you have to look at that safe harbor provision, which makes clear that Congress believed that a rail vehicle continues to be in use, even when it is being hauled to a place of repair. Thank you. Justice Breyer? Justice Alito? I understand that there's a safety gap if we apply a different meaning to use for locomotives and tender from railroad cars. Is there any other reason? It does seem like illogical that a railroad car sitting attached to the locomotive on the side, waiting for 15 minutes to get a spot into the rotation, that that's going to be treated differently. I think under your client's theory, the locomotive, while it's moving on that train that's going from station to station, wouldn't be covered. Not under the FRA's approach, but I believe that may be a respondent's. That has to be a respondent's, because he's basically, or what my colleagues are saying, it's not powering the train, but even if it was moving in the train, they would say there was coverage for a worker under FELA, but a different coverage under the railroad car. Is there a problem with that kind of system? Yes, it's not the system that has been enforced. I think there is a wonderful 1993 publication by FRA that talks about 100 years of the success of these safety laws. One of the points it makes is that before these safety laws, you used to be able to figure out how long someone had been in railroading by how many fingers they had. They used to put advertisements for prosthetic devices in catalogs for railmen because of the extreme dangers. Then Congress passed these laws, and this court has long interpreted them in harmony. You look at Lilly, I believe it's the court admits that people have been confusing even calling the LIA the SAA. The courts have been interpreting them in harmony for all of this time. To sort of go back on that, we would risk going back to the bad old days. Now I do want to put a little caveat in there, because in 1970, Congress passed the Federal Railway Safety Act, which does give FRA supplementary authority to regulate beyond the LIA and the SAA. So I just want to be clear, they do have some of that authority. Justice Kagan? Justice Gorsuch? The one anomaly they point out, or one of the anomalies they point out, is the inspection every day under your theory of in-use. Can you answer that? Sure. So if, in fact, I think they're hypothesizing there will be locomotives that are not being used for days and days at a time. If that happens, what carriers do is put them into storage. And there are ways you can put a locomotive in sort of short-term storage. Again, you unhook the battery, you drain the fluid so you don't have the concern about fuel. So if a locomotive has been placed in storage, then the FRA would not apply the daily inspection requirement. But if a locomotive has not been placed in storage, then it is still in use. And the FRA's concern is, let's say they're using it in what would be called ready or protective service, which is ready to go rescue a passenger engine or somebody else. Then that locomotive needs to be safe so that if there's an emergency and it starts moving, there's not going to be an accident because it's all of a sudden started. So storage, though, if it's on the sidetrack for a few days, you would say it's not in storage unless it's been drained of fuel and the battery's been disconnected? It needs to be effectively rendered inoperable. Again, what FRA's concern is— And what would you—well, just to be clear, and what's necessary to render it inoperable or your theory or under the regs? Actually, different railroads have different processes. And, you know, they do have manuals where they explain how to put something into storage. Usually, as I say, it's at least you're unhooking the battery, you're draining the fuel. You can also— You can be in storage while you're still on the sidetrack? You can be in storage while you're on the sidetrack. Now, sometimes what carriers will do is actually sort of—I think it's like staking a track to separate out the track just to make sure, absolutely, 100 percent sure that that car is completely separated. But, yes, FRA does not deny that there are many cars that are in storage. But, again, they have to be rendered inoperable because FRA's concern is that when a carrier just says, oh, we weren't using that car, employees are treating that car as in use. Employees are going to be getting into that car. They're going to turn the ignition switch. They're going to move those wheels. And so it has to be more than just the carrier having decided that it's no longer in service. Thank you. Justice King? Could I ask a follow-up to that? I mean, when you say unhook the battery, drain the fluid, you know, in comparison to all as Justice Breyer says a lot of words. I mean, unhook the battery and drain the fluid? Now, that sounds real to me. Is that really what you're saying? It's like in use or not in use, depending on have you unhooked the battery and drained the fluid? I mean, yes, although you could also have just taken the whole locomotive and put it over a pit. So, similarly, it's inoperable. The fear here, and just to be very clear, FRA's fear is locomotives are sitting on a sidetrack, and the carrier is saying they're not in use, so it's fine that they have all of these safety problems. And employees are getting on those locomotives. They are having accidents. They could be moving those locomotives. And again, imagine the defect is a fuel tank. That fuel tank scrapes along the ground, and there is an explosion. So that is the fear. But once the carrier has done something to make sure that that just cannot happen, then it has been withdrawn from use. And that something is usually unhook the battery and drain the fluid? Yes, again, sometimes they wrap these things in big, actually, apparently, tarps. There's an incentive for carriers to do this, too, because FRA's explained to me, if you leave all the fluids in a locomotive, you could have freezing problems. Also, there's something called condensation from the fluids that gets into the different parts and will actually wear away. So there are good reasons, even beyond the obvious safety rationale, that carriers actually are doing this pretty regularly anyway. Thank you, counsel. Mr. Ballinger? Thank you, Mr. Chief Justice, and may it please the Court. It seems to me that Petitioner and the government are just rewriting the statute that Congress wrote. All of this about draining fluids and unhooking batteries isn't in the statute. I don't even think it's in the regulations. I've never heard it before. It appears to be arguments of counsel about what all of this should mean. Union Pacific has certainly never enlightened me that taking a locomotive out of use requires that you disconnect the battery and drain the fluids. Now, as a matter of plain meaning, one uses a locomotive to move railcars. The original language of the statute made that crystal clear by prohibiting the use of locomotives in moving interstate or foreign traffic if they were unsafe to operate in active service. And that active meaning is confirmed by the statutory language that says that defects discovered during inspections have to be repaired before the locomotive is used again. That language is literally impossible to comply with if Petitioner and the government are It's also confirmed by the absence of any safe harbor for repair movements in the LIA, like the one that's in the Safety Appliance Act. Justice Kagan, there is no safe harbor for the movement of defective locomotives in the Locomotive Inspection Act. There is a regulation that governs the safe transport of defective locomotives. That regulation is consistent with the statute only because Congress understood that a locomotive being hauled dead is not in use within the coverage of the Locomotive Inspection Act. If it were, then that regulation would violate the statute and the Locomotive Inspection Act would forbid exactly the same repair movements that the Safety Appliance Act explicitly authorizes even if the only safety defect on the locomotive was a safety appliance defect. Obviously, Congress didn't intend that. And for those reasons, the LIA will not support Petitioner and the government's proposed even if they were right under the Safety Appliance Act. But I actually have come to believe that this court needs to reject Petitioner's understanding of the Safety Appliance Act as well. Petitioner and the government suggest that a locomotive is in use basically all of the time that it is outside a dedicated place of repair. I'd like to offer a new observation that isn't in the briefs. That view would actually render the safe harbor in the Safety Appliance Act meaningless. A safe harbor for moving defective locomotives is worthless if the trigger for penalties is not movement and if the locomotive is subject to the exact same civil penalties, whether it moves the car or not. Well, how, under your view, the locomotive is there, you know, they stop for lunch and the locomotive is still on. It's still idling. It's going to pick up again and go in 45 minutes. That locomotive, you would say, is not in use? Well, Your Honor, the way the lower courts understood the facts of this case, and I think they were right, is that this string of cars came in from Chicago. It was parked on a back track. The train crew went home and there was going to be a complete turnover of the train crew and they were going to assemble a whole new train for the next movement. And there is an allegation that this locomotive, which was the third in the contest, was idling. But that doesn't tell you anything. Locomotives idle for all sorts of reasons. Justice Breyer, they turn themselves on automatically, as well as turning themselves off automatically. These locomotives have systems that will turn themselves on if the battery needs to be charged. So your answer to my question is yes, you would not consider the locomotive, you know, they're stopping for lunch at the station and they keep the thing idling and they're gone 45 minutes. During that 45 minutes, the locomotive would not be in use? I think if they have parked it on a back track off of the main line and the train crew has left the locomotive, then it is temporarily out of use as a locomotive under the Locomotive Inspection Act. What about the... When I was a child, there was a book called The Little Engine That Could. And this engine got to a hill. And it goes up the hill and suddenly it stops. Because it can't go further. But it thinks, I think I can, I think I can, I think I can. And eventually it does. Okay, now let's take the period, I think I can. There it is, not moving. And on your view, here it is. You say on page 1516, is moving under its own power in active service. Not The Little Engine That Could, not during those periods. He was saying, I think I can, I think I can. So do you really mean? I mean, that's the same as a lunch question, really. No, I actually think that it's quite different, Justice Breyer. FRA's own definition of an active locomotive movement, not a dead movement, is the application of tractive power. The Little Engine That Could is applying tractive power, even if it's having a hard time. Applying tractive power, you mean its engine's turning? Yes. It has gas. No, its engine is turning and it is applying tractive power. What is applying tractive power? You mean the thing is turned on? It's applying torque to the wheels, Your Honor. It's applying torque, I see. That's the test. Now you see where we are. And you've heard this argument. And this argument, to me, my real, that was just trying to get you to think in the mood, there are so many different things that that's why I was back to Lord Cook. But if that's the right approach, that we say, let's handle this case as an example, he says, here, you came in 10 minutes after, you were leaving in an hour, and the engine was running. I mean, it makes a difference whether the engine is running and it actually applies the force to the track, or it doesn't apply the force. Now we seem to be in that thing about turning off the battery, et cetera. Absolutely, Your Honor, under the actual regulations, the actual regulations say that a dead locomotive movement is a movement when the locomotive is not applying tractive power. And they explicitly say that the locomotive can be idling. And the actual facts of this. They say it can be idle and not in use when it's idle. 49 CFR 229.5 and page 8-8 of FRA's motive compliance manual, both say that a dead locomotive can be idling because sometimes they need to idle in order to charge the batteries, they can turn themselves on. And Your Honor, the key to these statutes, to both statutes, is that safe harbor in the Safety Appliance Act. This court held in the Rigsby and the Otis cases that the existence of that safe harbor makes clear that a movement for repair purposes would otherwise be covered by the Safety Appliance Act. And that's right, because otherwise the safe harbor would be unnecessary. But it demonstrates just as powerfully that a rail car even, just sitting passively in a yard or on a siding, is not covered, even by the Safety Appliance Act, because otherwise the safe harbor would be meaningless. Counsel, locomotives, by definition, are more dangerous than railroad cars. They explode. And so I don't take much from the absence of a safety out in the LIA. But I do go back to the original question the Chief started with. If this locomotive, this fed locomotive, the one that was being powered off, is being dragged with the rest of the train and only its brake is connected, you would say it's not covered, even though it's connected to railroad cars that are covered by the SAA? Just like every other vehicle in that train, it is in use as a vehicle within the meaning of the Safety Appliance Act. It is not in use as a vehicle within the Locomotive Inspection Act. In the absence of a safe harbor? Then how do I deal with a tender and the definition of use and Lilly? Because we considered a tender that was off track to be in use on a sidetrack. So it's not within your definition. I'm not sure about that, Your Honor. Now, several things about Lilly. Lilly did not address the in-use question. It wasn't litigated or decided in the case. It appears to have just been assumed. That may be true. One has to take that decades and decades of jurisprudence when railroads were the main means of transportation in our country, and nobody's questioning what in-use means, that it was understood. I don't take the silence of those cases as terribly meaningful to me. To answer my question, a tender is covered by the LIA. Yes. What, how does your definition get us to deal with a tender? So it doesn't go under its own power. It itself doesn't do the dragging. So give me a definition under the LIA that could be applicable equally to the locomotive and the tender and its definition of use. So I think in Lilly, the locomotive and the tender had just been detached from their train, which was ready to go, and they just essentially pulled up to a gas station to be fueled in anticipation of eminence. Well, you told me before that if the train's not revving to go and revving to go to pull things, it's not in use. So going off to a fuel tank is not in use, according to your definition. No, Your Honor. I think a locomotive, just like an automobile, doesn't go out of use at stoplights. Just because it temporarily stops momentarily doesn't mean that it's out of use. The basic concept is movement. Once you set it in motion, it's in use. You take it out of use when you park it. And there's no safety gap here. The FRA's regulations governing the safe transportation of locomotives and the safety of locomotives sitting there in a rail yard are perfectly supported by its plenary authority over railroad safety under the FRSA. You don't need to stretch the LIA beyond all recognition in order to ensure that FRA has the power to ensure that locomotives are safe in every single situation. Do you think the SAA was stretched beyond all recognition in Brady? Well, I think that you have to read Brady narrowly, because if you read it as broadly as Petitioner and the government read it, then you render the Safe Harbor and the Safety Appliance Act completely meaningless. Now, I think the right way to understand Brady is that... I don't understand that. The premise, I think, of the Safe Harbor is that it otherwise would be considered in use, correct? The Safe Harbor protects the railroad from civil penalties for moving a car in a defective condition. But if the railroad is subject to the exact same civil penalties for possessing the car sitting there on a siding or in a yard, then the Safe Harbor doesn't protect from civil penalties, doesn't protect the railroad from any civil penalties. Well, back to Brady, I take from your initial comments that you're not just looking to have a narrow interpretation of the LIA, but actually to scale back what Brady and a slew of cases said about the SAA. Is that accurate? Well, I think Brady is the outlier. I think that all of the other cases, use was equated with movement. And we can talk about those. I don't want to... I mean, there are a lot of sidecar, dining car... We don't have to get into all of them. But anyway, Brady is... I would very much like to, Your Honor, because I think it's important. So in the Brady case, I think you have to understand that case as essentially an automobile stopped at a stoplight. The terminal association was tendering that car for immediate onward movement to the Wabash. The Wabash was held not to be using that car during the inspection. The terminal association was held to still be using it because they were tendering it for immediate onward movement. They hadn't even parked that car for the night. They were offering it up to go forward. And in all of the other cases, Johnson and Delk and Rigsby and Otis and Schindle, every single one of those cases, the accident happened in the course of an immediate effort to move the car. Petitioner and the government like to emphasize the Johnson case with the dining car that was dropped off for a while by the westbound train and then picked up by the eastbound train. But the actual use that triggered the SAA in that case was that the crew of a passing freight train stopped to turn that car around so that it would be in position for the eastbound train when the eastbound train arrived several hours later. And in going between the cars to try and couple up to turn it around, the employee was hurt. So he was hurt in the course of an immediate attempt to move the car. And the hard question in the case wasn't whether that dining car was in use. It obviously was. It was being moved. The hard question in the case was whether that use was in the interest of a company. So the reading of Brady that says the dividing lines where it's reached a place of repair, which is what it says, you reject that? I think that that interpretation renders the safe harbor for repair movements in the Safety Appliance Act utterly meaningless. It would do absolutely no work under Petitioner and the government's interpretation. Because, I do reject it, because the only way to evade use in their view is if the car is already at a place of repair. What good is a safe harbor for moving it to a place of repair if the only time that it's out of use is when it's already in the place of repair? It doesn't make any sense, Your Honor. What about a different kind of focus, but their argument is that most of the accidents with respect to locomotives occur when they're stationary, and that your position, therefore, leaves the statute not addressing the primary problem. What's your response to that? Well, the primary problem to which the Safety Appliance Act is directed is coupler accidents, and that's the LIA to move the car. The Locomotive Inspection Act was about the safe operation of locomotives in moving interstate or foreign traffic. You said moving a couple times. It was taken out in 1924, so I don't think moving gets you that far. Well, but the statute, Congress took that language out in order to make clear that it could be an intrastate movement, because it was really hard to prove whether the movement was intrastate or interstate. But I don't think that Congress meant to decouple the basic concept of use from what it had always been, which was movement. Sorry to interrupt, but just on the focus, most of the accidents, the amicus briefs tell that occur with respect to locomotives are when the locomotives are stationary, and I just want to get your response to that. Under our interpretation of the statute, the LIA frequently applies while a locomotive is stationary, because an automobile stops at a stoplight is still in use. You have to affirmatively park it. You don't have to take it apart or disassemble it like the government suggests. You acknowledge, don't you, that this statute imposes obligations on the railroads to do things before the train starts moving? Yes. I mean, the whole notion of the statute, right? I mean, it is a regulation of the railroad's use, which you say is its movement. Maybe it is, maybe it's not. But there's the entire statute. It's not like you take all these precautions once the train is moving. You take all these precautions before the train is moving so that you don't violate the statute when you move the train. What I'm saying, Mr. Ballenger, is this statute is a preventive statute in its very essence. It says do a lot of things while the train is parked in order to get it ready for whatever you might want to do with it afterwards. I'm going to resist you a little, Justice Kagan. What the statute says in 207-01 is don't use a locomotive if it is unsafe to operate. But the only way you can use a safe locomotive is to make it safe before you're doing anything with it. So the entire statute is all about take precautions, take preventive measures, do a lot of things before you actually do anything with it. And that suggests to me that it makes more sense to read the statute as a kind of could be operated as opposed to right now in operation the wheels are moving. Because the whole point of this is get the car ready. Get the car ready for whatever you might decide to do with it. And the Seventh Circuit's insight that is the foundation of their decisions for 70 years in this area is that since the point of the statute is to incentivize the railroad to get it into safe condition before using it, you have to give the railroad a chance to get it in safe condition. Petitioner is the person who was supposed to inspect this railroad for safety defects. And although it's not in the record because Petitioner felt free to cite it from an internet source, I would direct the court to section 31.2.1 of Union Pacific's operating manual, which says that it is the duty of the engineer to ensure that the daily inspection has been performed before using a locomotive. His position up to and including the argument that we just had in this case has always been that this locomotive was overdue for inspection. So if the question here is whether Union Pacific has deemed this locomotive ready for use, the answer is not without inspecting it, and it was your job to inspect it. The Seventh Circuit's recognition, I think, in the Lyle and the Tisnero cases 70 years ago that preparing a locomotive for use is the opposite of using it is exactly consonant with the understanding of the statute, I think, Justice Kagan, that you're putting forward. Yes, the point is to incentivize the railroad to do a great job preparing it for use, but you've got to give them a chance to do that. And I think I really want to emphasize that the safe harbor in the Safety Appliance Act structurally forbids their interpretation, I think. It has always been central to this court's understanding of the statute in the Rigsby and the Otis cases. If Petitioner and the government are right, the absence of any comparable safe harbor in the Locomotive Inspection Act means that it is impossible to transport locomotives for purposes of repair, and the LIA forbids exactly the same repair movements that the And it also applied under the SAA, their understanding would mean that that safe harbor from civil penalties protects the railroad against literally no civil penalties. That can't be the correct understanding of the statute. And the right, Justice Breyer, I think that your instinct that we should read the statute that Congress wrote is the right instinct. Everyone understands the desire for a bright line rule. But sometimes Congress writes statutes that require the application of some common sense. And here, that's the statute that they wrote. Why doesn't common sense? Look, Brady does seem like common sense. The car is traveling along. It comes to the place where it stops. It stops. It's still on the track. It's just about to go to the Wabash Railroad. And the inspector, whose job it is to inspect, goes and falls, and the defect is there. Okay. This was a car that came along. It was coming from Salem, I guess, or going to Salem, Chicago. It was there in the middle of the decision about whether to keep it as a car, use it as a railroad. The engine is still running, although I agree, I don't know about traction, whatever that is. It may not be there. And they have the accident. Okay. It's pretty close to the Wabash thing. And I grant you that it's a different statute. But use is a function of total circumstance. So why not? So can I clarify the total circumstances here? The total circumstances are, on the record, that this string of cars and three locomotives came from Chicago more than an hour before, not 10 minutes before. And it left Salem for Dexter, Missouri, not an hour later, but at least four hours later. The accident happened at 3 in the morning. And it took them three train movements and more than four hours to put together a different train for the run to Dexter. And the Court of Appeals and the District Court looked at all of these facts, that it was parked on a backtrack, that no one was even planning to use this locomotive as a locomotive for the forward movement. The train crew had been sent home, and they still needed to put the train together for its next movement, and said, no, they're parked, right? And that sort of common-sense, factual insight, I think, is the sort of judgment that Congress intended for courts to make under this statute. And Petitioner accuses us of adding words to the statute by suggesting that we want to draw a distinction between use as a locomotive and use as a vehicle. Again, I think that the safe harbor difference between the two statutes absolutely demands that you recognize that locomotives are sometimes in use as vehicles and sometimes in use as locomotives. But also, this court's SAA precedents already recognize that vehicles can be in use in different capacities. The holding of the Erie case is that during yard switching movements, to put a train together, those cars and those locomotives are in use as vehicles and maybe as locomotives, respectively, but they're not in use as a train for purposes of the SAA's distinct requirements that apply only to trains. It's not a train until the train is fully put together and it's ready to move out onto the main line. And so the lesson is that when you are using a locomotive under its own power to move cars around a yard, that locomotive is in use as a locomotive, absolutely, it is applying tractive power. It and the cars are in use as vehicles. None of them are a train yet. Well, similarly, we're just asking the court to recognize that when a locomotive is being hauled dead, or let alone being prepared to be hauled dead, it will be in use as a vehicle within the coverage of the SAA, which will supply all of the safety requirements that Congress and the FRA have ever required for vehicles that are going to be passively moved, right? I mean, whatever you need for a boxcar or a hopper car to passively move it to be safe for everyone involved is within the coverage of the SAA. And if you're moving a locomotive dead, all of those same requirements apply. All of the holdings of this court's SAA cases apply. The only question is, is that locomotive also being operated as a locomotive? I'm sorry. Is there better coverage under the LIA than the SAA? Because you seem to be saying this was covered by the SAA, but not the LIA. It certainly was once it started moving, covered by the SAA, because it's a vehicle. Oh, okay. So the fact that it was going to be moving as a dead locomotive, that's not enough for you? Because the actual locomotive that was picked and wasn't powered down hadn't started to move anything yet? Is that what your position is? Our position is that while it's sitting there on the track, it might or might not have been idling. That tells you literally nothing about whether anybody had ever used this locomotive or was planning to use this locomotive. Well, I don't think it's ever... You don't get that from it sitting there. You get it from what the intent of the railroad. And we always have to look at that, don't we? Well, I think if you're looking at the intent of the railroad, nobody intended to use this locomotive as a locomotive, even for its next movement, and it was not. And Petitioner was injured... So he should have stood under the SAA, is what you're saying. Maybe. There certainly would have been a much better argument. So the FRA's own definition of in-use for purposes of the Safety Appliance Act is in its motive power compliance manual and in 49 CFR 232.9. And their definition is that a rail car, including a locomotive, which is a car under the SAA, comes into use when it's moving or shortly before movement if all inspections have been completed and it's deemed ready for imminent movement. And I... Thank you, counsel. Thank you. Are we done? Your test would be imminent, right? Would encompass imminent movement? It would. The case law and FRA have always recognized that a rail car can come into use shortly before imminent movement. Just as if you get in your car and you turn the key and you put your foot on the brake and put it in gear. Should we flesh out what imminent means any more than that if you were to prevail? I think it's a common sense concept and it is tied in FRA's compliance manual in the case law and in 232.9. So whether the inspections have been completed. And it is Petitioner's position throughout this case and at this argument that this locomotive still needed its inspection if it was going to be used at the time. It was not ready for use. Justice Thomas, any questions? Yes. Thank you, Mr. Chief Justice. Mr. Ballenger, was there any indication that this locomotive had been cleared for use? It seems as though I'm confused as to whether or not anyone ever suggested that it's okay to use this particular locomotive. Union Pacific's operating manual forbids the use of locomotives that are overdue for inspection. Petitioner's position throughout this litigation, including today, has been that this locomotive is overdue for inspection. Therefore, Union Pacific did not deem this locomotive ready for use until it was inspected. The other thing that I asked Petitioner and the government about, I know it's a little bit off-topic, towing my car, which in motorhome world is referred to as a dinghy, to various places. And they suggested that the mere fact that I was towing and the lights worked, and I had a braking system, which, by the way, is independent from the car's vehicle, I mean, the tow vehicle's braking system, that I was using that vehicle. Could you react to that just briefly? So I think it's debatable as to the motorcoach. I think it's not debatable as to the tow vehicle. The hypo that I would propose is you tow your motorcoach to a campground with the tow vehicle. No, I'm towing the car, not the motorcoach. It's the locomotive character. Yeah, it's towing the vehicle. You're towing a car behind the motorcoach. Exactly. I think that that car is not in use as a car while you are passively towing it. I had in mind the more, you know, a tow-behind RV, and you tow it to a campground, and you park, and you go out to dinner. Clearly, the tow vehicle that you used to pull your RV is no longer in use when it's parked at the campground. Yeah, you're thinking more of a trailer or a fifth-wheeler. But let's go to another thing. There's some talk about stationary locomotives. Is there any instance in which a stationary locomotive is in use? Not being hauled around the yard for repairs. You did discuss that, but it's just sitting on the track. If it is sitting there as part of a train, and the train has stopped at a red light, you know, waiting for a switch, then I think it hasn't been taken out of use yet. I think if it is parked on a back track, and the train crew goes home, it is out of use. And I think the Rowdenbush case from the Third Circuit in 1947 explains those distinctions. Okay, final question. You seem to suggest that our test should be a totality of circumstances. Could you give us an indication of what circumstances or what considerations are required in order to make the determination as to whether or not a vehicle is in use? I actually am not sure it's totality of circumstances. I think in this context, use, the basic concept is movement. FRA and the case law have recognized that imminent movement can be enough if all inspections are completed. And then on the back end, it goes out of use when it's genuinely parked. Not to stop at a switch, but genuinely parked for the night. Thank you. Justice Breyer? Justice O'Daymore? Justice Kavanaugh? In the SAA, if there weren't the safe harbor, would that otherwise be considered in use when it's being moved for repairs? This Court's insight into Otis and Rigsby cases was that the safe harbor definitely tells you that it would be in use, because otherwise the safe harbor would be unnecessary, right? Right. And I think that a car being transported only for purposes of repair, if that safe harbor weren't there, I think that might be debatable. But it's not debatable anymore after the safe harbor, as this Court recognized in Otis and Rigsby. But in those cases, like Delk, I urge Your Honor to read the Delk opinion. It clearly equates use with movement. What the railroad was blamed for in that case was moving the railcar around the yard. This Court said that once the defect was discovered, it should have been withdrawn from use. It was not. The railroad continued moving it about in connection with other cars. And that's why the SAA applied. Not because it was just sitting there. Because they moved it. Brady was just sitting there. Yeah, you don't like Brady, though. It was tendered for immediate onward movement. And if you interpret the case as holding that park railcars are always in use, then you render the safe harbor meaningless. I think you can't do that. Thank you. Thank you, Counsel. Rebuttal, Mr. Frederick. So in addition to the brief, Respondents offered a new test. And it's got to be torque to the wheels constitutes use. While later in his argument, he said and conceded that imminent movement was going to be enough. The problem with Respondent's test, this torque to the wheels concept, is that that adds worse to the statute when what we're looking at is whether the carrier may use a locomotive and whether it is safe to operate. That's what the statute says. The locomotive here can go on or off, which means that we're going to defer the application of the statute, according to the railroad, by the particular technical equipment on the locomotive. That makes no sense. Locomotives perform the use of backup power, braking services, connections. He never addresses that at all in their brief or in their argument. So if the locomotive is towed, it still can perform the railroad's use of being at a place where it can perform other logistics necessary. The railroad's theory now, and blaming my client for being the one who got on the locomotive, now turns the statute completely on its head. Because it's not the carrier who determines whether the locomotive is used. It's the worker. Well, that makes no sense because the worker is the one who got hurt. And he's the one who is deciding whether or not to keep the locomotive powered on or off for its continuing journey from Salem on to Dexter. Mr. Chief Justice, the restaurant example is not in use on the railroad's line, and so it would be outside of the statute. For that reason, you wouldn't have to get into the peculiarities of use. Under the SAA, the car applies and it is in use even if it is empty. So it makes no sense to apply use in a different way under the LIA, whether the locomotive is on or off. And as we say, empty cars are clearly in use under the SAA, and workers can be hurt when they are done in that particular function. We urge a broader reading of in use because the whole purpose and the words of the statute were to protect workers, but having a narrow constriction of the statute as proposed here by the railroad would completely gut the rules. The slipping hazard here that is the regulation is for an exterior walkway that no worker uses when the locomotive is in motion. The locomotive is being inspected and being serviced or being put on or off by the worker getting on the passageway that has to be safe under the rules. So under their example, it would be completely gutting the regulations. Now, I dare say I run some risks by going back to Justice Thomas's towing example, but because he mentioned it, I want to try to urge the court to think about use in the sense of the entire trip that he was making. For his entire trip, he is using the car for vacation or for whatever purposes he has for that, and I would urge the court to consider use in that broader application sense. Thank you. Thank you, counsel. The case is submitted.